## BELL et al. v. BELL et al.
### No. 6208.

Court of Civil Appeals of Texas. Amarillo.
March 3, 1952.

Rehearing Denied April 7, 1952.

Court of Foard County admitting to probate the will of Ezekiel Bell, deceased, and declaring both the former judgment and the will invalid for lack of mental capacity of the testator to execute the will and because of the exercise of undue influence upon him by others. The testator was 62 years of age at the time of his death on November 6, 1948, and his estate consisted of both real and personal property of the value of more than $30,000.

Contestants are children born to the first marriage of testator, namely: L. D. (Darvin) Bell and Mrs. Mary M. Todd, joined by her husband, Walker Todd. Proponents are the surviving widow of the testator and a daughter born to her and the testator during their marriage. The widow, Mrs. Mary Bell, was sued individually and as executrix of the estate of the deceased and the daughter of her and deceased, Mrs. Virginia Henley, was sued, joined by her husband, Tommie Henley, as a beneficiary under her father's will. During the proceedings and prior to the final hearing by the trial court proponent, Mrs. Mary Bell, married Charlie W. Barker, who was made a party to the suit on January 8, 1951, as a result of contestants' petition and prayer that scire facias issue.

The record reveals that testator's will was executed with the usual formalities on October 31, 1948, and that he bequeathed $100 to each of the children by a former marriage, Mrs. Mary M. Todd and Darvin Bell, contestants, and the remainder of his estate he willed and bequeathed to his wife, Mrs. Mary Bell, and his daughter by his last marriage, Mrs. Virginia Henley, proponents, and therein named his wife, Mrs. Mary Bell, as independent executrix.

Upon the application of Mrs. Mary Bell the will was admitted to probate by the County Judge of Foard County on November 22, 1948, without a contest and the judgment became final. Thereafter on January 4, 1949, contestants filed this suit in the County Court of Foard County against proponents seeking to set aside and nullify both the will and the judgment admitting it to probate upon the grounds and for the sole alleged reasons that the testa-

Harry Bunnenberg, Vernon, Jim Sowell, Quanah; Foster Davis, Crowell, for appellants.

Brookreson & Brookreson, Seymour, R. R. Donaghey, Vernon, for appellees.

PITTS, Chief Justice.

This is an independent suit seeking to nullify a former judgment of the County

tor "was not mentally competent to execute a will" and because the "said purported will" was executed by him as a result of "the undue influence of Mary·Bell", his wife. Proponents answered by pleas of general issue and the case went to trial before the probate court on March 13, 1949, after all parties and their attorneys announced ready for trial. Contestants introduced some documentary evidence and the oral testimony of contestant, Mrs. Mary M. Todd, concerning some of the family history but no evidence was there offered or heard upon contestants' alleged claims of testator's mental incapacity or their alleged issue of undue influence. Proponents offered no testimony and did not contest any of that offered by contestants. As a result of the hearing the probate court denied contestants any recovery and, in effect, upheld the validity of the will and its former judgment admitting it to probate, from which order contestants gave notice of appeal to the District Court, executed an appeal bond in support thereof and caused the proceedings to be filed with the Clerk of the District Court on April 11, 1949.

Prior to any hearing held in the District Court proponents filed a motion and a plea in abatement in that court on September 3, 1949, seeking to have the appeal dismissed. The trial court however declined to hear such motion and plea in abatement but instead on September 20, 1949, heard and sustained a motion filed by contestants seeking to have the case dismissed, which, in effect, would have caused the order of the probate court admitting the will to probate to be nullified and set aside. After sustaining the contestants' said motion the trial court's judgment was accordingly so entered from which proponents appealed to this court. On January 23, 1950, Tex. Civ.App., 245 S.W.2d 767 this court held that the trial court had jurisdiction only to hear proponents' motion to dismiss the appeal and plea in abatement; that it did not have jurisdiction to enter a final judgment on the merits or dismiss the cause of action and that it committed reversible error in refusing to hear and pass on pro-

ponents' motion to dismiss the appeal and plea in abatement. The trial court's judgment dismissing the case and ordering its action certified to the probate court was reversed and the cause was remanded with substantial authorities cited in support thereof. No appeal was perfected from our judgment in that action and it therefore became final. This matter will be further hereinafter discussed.

Thereafter on May 4, 1950, proponents filed an original proceeding in this court alleging in a verified pleading that the trial judge, Honorable Jesse Owens, had declined to hear and pass on their motion to dismiss the appeal and plea in abatement and had announced his intention to proceed with the case on its merits in a manner contrary to the pronouncements of the law made by this court in its opinion of date January 23, 1950, for which reasons proponents sought by mandatory injunction to compel the trial court to hear and pass on their said motion and plea in abatement. Upon considering proponents' petition this court immediately issued a restraining order prohibiting the trial court from proceeding in any manner in the cause of action, other than to hear and pass on the said motion and plea in abatement, until a further hearing could be in this court. The matter was set for hearing on May 8, 1950, and the trial judge and contestants here were properly served. The trial judge asked next day for a postponement of the hearing in this court to May 12, 1950, which request was granted and all parties so notified. In the meantime on May 8, 1950, the trial court heard and overruled respondents' motion to dismiss the appeal and plea in abatement and furnished proof of such action at the hearing held by this court on May 12, 1950. On May 22, 1950, this court handed down an unpublished per curiam opinion in which it found that in as much as the trial court had heard and passed on proponents' said motion and plea in abatement and that proponents had preserved their assignments of error concerning the same, further mandatory injunctive relief would be denied, without there expressing an opinion concerning the law

governing the trial court's action in the matter or in any manner passing on the merits of the case.

Thereafter on September 17, 1951, trial was begun before a jury and concluded in time for the trial court to overrule proponents' motion for a peremptory instruction and to render a judgment for contestants and against proponents upon a jury verdict on September 21, 1951. The judgment having been entered less than 5 full days before the expiration of the term of court, no motion for a new trial was filed and was not required to be filed. Rule 324, Texas Rules of Civil Procedure. From the judgment entered an appeal has been perfected to this court. No issue on the question of undue influence was requested or submitted to the jury in the District Court. Only the issue of testamentary capacity of the testator was submitted and the jury found that testator did not have testamentary capacity.

It must be remembered that this is not an appeal from an original proceeding admitting the will to probate, but this is an attack made upon the validity of a will that had already been admitted to probate without a contest and a final judgment so entered. The proponents who offered the will for probate originally assumed the burden of complying with all legal formalities and of establishing the necessary prerequisites for its validity. These matters were heard and determined by the probate court in the original proceedings and every presumption must now be indulged in favor of the validity of the will. The rule always obtains that testamentary incapacity will never be presumed as to the testator of a will duly probated and the burden rests upon those who seek on such grounds to set aside a will duly probated and show, if they can, such testamentary incapacity. Those who seek in a new suit to set aside a will that has already been admitted to probate on the grounds of testamentary incapacity or undue influence, or both, have the burden of establishing such charges by a preponderance of the evidence. Cook v. Denike, Tex.Civ.App., 216 S.W. 437; Barton v. Bailey, Tex.Civ.App., 202 S.W. 2d 277, and other authorities cited in these cases.

Proponents charge principally that the trial court erred in refusing to sustain their motion to dismiss the appeal and their plea in abatement which were urged by them again just before the trial on the merits began and again during the trial; that the trial court likewise erred in refusing to quash the jury panel; that there is no evidence of probative value to support the jury finding and that such finding is contrary to the great weight and preponderance of the evidence; that improper evidence was heard and admitted before the jury and that the trial court erred in permitting counsel for contestants to make an inflammatory and prejudicial argument before the jury. These assignments of error will be discussed by us in the order that seems most logical to us rather than in the order presented by proponents.

The opening argument of counsel for the contestants made by Honorable D. J. Brookreson was the only argument made before the jury After his argument was heard by the jury, counsel for proponents waived argument and no further argument was heard. Proponents present five bills of exception approved without qualification by the trial court upon which they predicate six points of error complaining about the opening argument of Mr. Brookreson. The bills of exception cover more than ten pages of long typewritten paper and are too lengthy to be restated in full here but they are each in proper form and set out the argument of counsel that led up to the argument in each instance about which proponents complain. Only excerpts of the objectionable argument will be here stated.

In his argument Mr. Brookreson said in part:

"Now, gentlemen of the jury, there is a will. Whose will is it I ask you in all fairness. Was that the will of Ezekiel Bell, or was it the will of Jack Roberts (who drew the will for testator) and Mrs. Barker (testator's wife). Now whose will was it? * * * Jack Roberts, is that the reason he didn't:

finish the will? Was it because Zeke insisted all the time that he put a clause in there that if Mary married again it went back to the children. Jack didn't say 'the children'. He was so impartial that he would say 'back to Virginia' * * * Whose will was that? He wasn't satisfied with it, was he? It wasn't his will. He held out all of these years, from 2 to 4, against Jack and Mary, because he wasn't willing to sign a will by which it would permit his wife to remarry before he got comfortably set in his grave before she would come up and get some other man that would go to spending that money that he had worked and saved, and we showed from the evidence that he saved for his boys to turn it over to them instead of her visiting Las Vegas, Nevada. Is that his will, or is it hers and Jack Roberts? * * * Now, gentlemen of the jury, I don't believe that is his will because he wasn't satisfied with it. We can't get Jack to admit that he wasn't satisfied with it * * * He was a good man, had the love of God in his heart as well as in his bosom and, according to that preacher that they brought in here, which we are not questioning, then his best friends come up there, including Jack whom he considered his friend * * * he signs this thing here, but, gentlemen, did he sign his will or did he sign Jack Roberts' and Mrs. Barkers' will? * * * I say, that will that testimony of Jack Roberts, and all, taken as a whole, shows conclusively, as I see it, that this is not the will of Ezekiel Bell; that because his mind was so enfeebled and diseased he signed it from you might say, just surrendered the last hour. Do you think, after he had held out four years, three, or two, whatever it was, insisting on the protest, that he would have suddenly yielded it if his mind had not been impaired? It broke down his will power, if he had all that will power, his mind was so diseased that he would do anything they asked."

During such argument counsel for proponents objected several times to the same for the reason a part of it was not supported by the evidence and that other parts of it was an argument made on the issue of undue influence which issue was not submitted to the jury and therefore not a part of the case. But each time the objection was overruled by the trial court. Counsel for contestants continued his argument by asserting that Mary (testator's wife) was the one that kept testator and his children by his first marriage apart, to which an objection was made for the reason that there was no evidence to support such an argument and that such argument was prejudicial and inflammatory but the objection was overruled by the court. Then, immediately following the trial court's action, counsel for contestants further stated in his argument to the jury:

"Whenever you step on a rat's tail he squeals, doesn't he? The truth is what hurts, and that is what my friend (opposing counsel) is trying to keep from you, the truth."

Again counsel for proponents objected to such argument as being prejudicial and inflammatory and asked the trial court to instruct the jury not to consider it, but the objection was overruled and the request denied by the trial court. Counsel further argued over objections:

"The truth always hurts. I am trying to get you to follow me. My friend (opposing counsel) seems to be attempting to conceal * * * now, gentlemen of the jury, we are not trying to take anything away from these folks. We want this will set aside (and the property to pass) according to the law of descent and distribution. If all this property is community property one-half of it is already Mrs. Bell's. How about the other half? The other half is divided into three equal parts * * * We don't want to take away from his wife over there, because she helped him earn it; she worked hard, I guess she did; and one-half of it is already hers and let her have it; but Zeke had this premonition and it seems like it come true; just exactly one year from the time poor old Zeke had his stroke she was over at Las Vegas,

Nevada, that noted place of taking chances, where people gamble.; she took a gamble and dug up old Charlie Barker that mysterious, quickly acquired successor, whom she, herself, said on the stand .she didn't know where he was."

Whereupon an objection was again made by opposing counsel for the reason that such argument was not supported by the evidence but was again overruled by the trial court.·.

Counsel for contestants argued that the will was not that of testator's but, if he did execute it, he did so under the influence of N. J. (Jack) Roberts and Mary Bell, then his wife. The uncontroverted evidence reveals that testator had been talking with his friend Roberts for several years about preparing a will for him and that Roberts finally prepared the will like testator wanted it prepared. Testator had previously suggested to Jack Roberts putting a clause in the will to the effect that if his wife married again after his death, all the property bequeathed by him to her would revert back to their daughter Virginia. But he did not request that such a clause be put in his will when it was finally prepared and no such clause was contained therein. There is no evidence showing that his wife Mary Bell had anything to do with the preparation or the execution of testator's will. The evidence also reveals that Charlie Barker lived in California when he and Mary Bell were married in Las Vegas, Nevada,. about a year after testator died. But the evidence does not support or even warrant the argument made by counsel concerning the kind or character of man Charlie Barker was or the argument about the gamble Mary Bell took in the City of Las Vegas, Nevada, "that noted place of taking a chance, where people gamble". The record does not support Mr. Brookreson's charge in his argument that opposing counsel was trying to conceal the truth from the jury. The record is voluminous consisting of 413 pages in the statement of facts which is in two volumes and 118 pages in the transcript. The parties are about equally responsible for the unusually large record

and there is nothing to indicate that either party sought to conceal any material matters from the jury. There was certainly nothing in the record to justify Mr. Brookreson's statement in his argument that "whenever you step on a rat's tail he squeals".

In the case of Western Union Tel. Co. v. Wingate, 6 Tex.Civ.App. 394, 25 S.W. 439, 440, a similar statement was made by counsel in his argument over the objection of opposing counsel and such was held to be reversible error. The statement was there made in the following language: "Gentlemen, you see the galled jade winces. They will do it every time you hit them." In connection with that statement the court there said:

"It is the right of every litigant, while acting in good faith, to object to any argument made to a jury on behalf of his adversary which he regards as improper and prejudicial to his rights; and it is not proper for opposing counsel to ask the jury, either directly or by implication, to consider such an objection as evidence against the party making it, on the merits of his case."

█ We recognize the rule that authorizes counsel in making an argument before a jury to discuss the evidence, draw legitimate inferences, deductions and conclusions therefrom. But continuous deductions, conclusions and inferences unsupported by the record, clearly unjustified, prejudicial and inflammatory constitute reversible error. Such is particularly true when an improper argument on its face, such as was here made by Mr. Brookreson, has the approval of the trial court as was shown by its continuous refusal to sustain an objection and its refusal to instruct the jury not to consider the improper argument. Such argument so permitted has the effect of confirming in the minds of the jury the charge made by counsel and the belief that proponents' counsel was trying to conceal the truth from the jury and be unfair with them and the court as well as unfair with contestants in their claims made. Texas Employers' Ins. Ass'n v. Drayton, Tex.Civ.App., 173 S.W.2d 782,

and other authorities there cited. In the case cited, Justice Folley, speaking further for this court and quoting from an opinion by Justice Sharp in the case of Chapin v. Putnam Supply Co., 124 Tex. 247, 76 S.W.2d 469, 470, said:

" 'It is not the policy of the law to impose the burden of showing harmless error upon the person whose rights have been transgressed. That burden rests upon the person in whose favor the transgression was made. The rule has been announced, and is adhered to by this court, that, when improper argument has been made, the adverse complaining party is entitled to a reversal of the judgment, as a matter of law, if, under all the circumstances there is any reasonable doubt of its harmful effect, or unless it affirmatively appears no prejudice resulted.' "

In our opinion the continuous improper argument made by Mr. Brookreson with the approval of the trial court was harmful and constituted reversible error. Woodard v. Texas & P. Ry. Co., 126 Tex. 30, 86 S.W.2d 38; Pacific Fire Ins. Co. v. Fain, Tex.Civ.App., 54 S.W.2d 226; Robbins v. Wynne, Tex.Com.App., 44 S.W.2d 946; Guest v. Guest, Tex.Civ.App., 235 S. W.2d 710; 41 Tex.Jur. 775, 801 and 813.

In his argument Mr. Brookreson also told the jury over the objections of opposing counsel that they (meaning himself and his clients) wanted the will set aside and the property to pass according to the law of descent and distribution and then proceeded to tell the jury how the property would be divided in that event. That kind of argument was held to be error in the case of Kindel v. Kindel, Tex. Civ.App., 57 S.W.2d 223. Such argument advised the jury what the effect of their verdict would be if it found favorable to contestants, which has been held many times to be error.

Proponents charge that the trial court erred in admitting testimony over their objections of witnesses Alton B. Bell, Mrs. Tom Bell and Dr. J. M. Hill concerning statements made by the testator and in his presence some 5 to 25 years prior to the date testator executed his will for the reasons that such statements, if made, were hearsay and too remote to shed any light upon the testator's mental condition at the time he executed the will.

Alton B. Bell, a nephew of testator, testified on direct examination and over objections concerning a conversation he heard between his father, who was a brother of testator, and his grandmother, Mrs. Margaret Bell, who was the mother of testator and his father, in the presence of testator. The conversation occurred concerning some financial difficulties testator was having about a debt he owed on 402 acres of land at a time when he was also having some domestic troubles with his first wife, Edith Bell, who was still living at the time of the trial. The witness testified that on that occasion his father said in the presence of testator and Mrs. Margaret Bell that testator did not know at that time what he could do or what he wanted to do, but you (meaning their mother, Mrs. Margaret Bell) was in a position to help keep the land for the children when his grandmother, Mrs. Margaret Bell, replied, "Well, if I can help the children I can live on bread and water" and that she did thereafter help testator with his financial difficulties. There is no evidence of any declaration made by testator there, the proof showing that the conversation was between testator's brother and mother made in his presence. The witness testified that the conversation occurred before testator was divorced from his first wife, Edith Bell, and that testator was divorced from her about five years before he married Mary Bell, with whom he had lived 22 years before he died in the year 1948. It would therefore appear that the conversation occurred some 27 years before testator executed his will on October 31, 1948.

In an action such as this, former declarations of the decedent are admissible (1) if they are actually the declarations of the decedent and not of another person, (2) if they tend to reflect the testator's state of mind at the time the will was executed, and (3) if they are not too remote

in point of time. The foregoing testimony of Alton B. Bell concerning declarations fails to meet any of these requirements and was not therefore admissible for any purpose. Helsley v. Moss, 52 Tex.Civ.App. 57, 113 S.W. 599; In re Caruthers' Estate, Tex.Civ.App., 151 S.W.2d 946; Parr v. Parr, Tex.Civ.App., 207 S.W.2d 187, and other authorities there cited.

The witness Mrs. Tom Bell, a sister-in-law to testator, testified on direct examination and over objections, that in April of 1943, testator came to her house and asked her to get some nurses to help care for Herman Bell, testator's second son by his first marriage, who was then seriously ill and died three days thereafter without leaving an heir of his own. The witness testified that while she was using the telephone trying to find some nurses testator said to her: "Don't mind the expense, if it takes the damn farm, it belongs to them anyhow." The testimony reveals that the statement of testator was made some 5½ years before he executed his will and at a time when his son, Herman, was seriously ill and just before he died. It does not reveal what farm testator was talking about (the evidence shows the testator owned several farms at that time). Neither does the evidence reveal to whom the farm he spoke of belonged. It is our opinion that the statement made by testator was indefinite, subject to more than one construction and does not have a tendency to reflect the testator's state of mind at the time his will was executed and that it is too remote, under the facts and circumstances and the authorities cited, to have any probative value for any purpose. The evidence was therefore not admissible for any purpose.

Dr. J. M. Hill testified on direct examination and over objections that some time before testator's son, Herman Bell, died in April of 1943, he tried to buy a certain tract of land from testator but testator refused to sell him the land and said he was keeping it for his boys and would not consider selling it at that time. Under the authorities cited and for the reasons heretofore stated such evidence was not admissible, for any purpose.

Proponents charge that a part of the testimony of three physicians given over their objections in response to hypothetical questions propounded to the doctors concerning testator's testamentary capacity was not admissible. Opinion testimony based upon hypothetical questions may have probative value and it may not. Whether it does or not depends largely upon the facts upon which such questions are based. Such opinion testimony can rise no higher than the facts upon which it is based. For these reasons such testimony should be carefully examined to determine if it has been predicated upon admitted facts or upon doubtful or controverted facts, which are not admitted by one of the litigants. In the case at bar it was not conclusively established that the testator had a stroke on or about October 22, 1948, some week or ten days before he executed his will. Yet in framing their hypothetical questions to the physicians counsel for contestants predicated their said questions in part upon a recital, claim, charge or statement that the testator had a stroke on the said date when the question of whether he did or not was doubtful and was not admitted by proponents. Other recitals in some of their propounded questions were likewise disputed by proponents. Contestants' claim of such a stroke was based upon the testimony of their lay witness. R. G. Gribble, a distant relative of testator. The witness testified that some time during the fall of 1948, possibly about October 13 (testator's widow testified positively that the date was October 13, 1948), he and testator had a casual conversation while drinking coffee in a cafe at Crowell. A few minutes thereafter as they walked out of the cafe testator said he felt sick and it looked as though his legs were going to "buckle" under him and he nearly fell but the witness caught him and he and two others helped the testator into a near-by barber shop. Immediately thereafter testator asked the witness to call a doctor in Vernon and his wife in Quanah. The witness did not call the doctor and found testator's wife had started home when he called for her. The witness likewise testified that testator was sane and rational

both before and after his apparent illness on that occasion. He further testified that testator's wife came in a car and got testator soon thereafter and that he (the witness) did not know whether testator had what was ordinarily called a stroke or not. There is no evidence indicating whether or not testator even went to bed as a result of his illness on that occasion. However, the hypothetical questions propounded to the doctors were predicated in part upon a recitation that testator had a "stroke" on the occasion related by the witness Gribble.

The testimony given by the doctors covers a number of pages in the statement of facts and is too lengthy to be restated here. A careful examination of all of the testimony about which proponents here complain reveals that many of the questions propounded to the doctors were adroitly framed and couched in language that would solicit an ultimate answer to the only question propounded to the jury by the trial court. Some of the answers given were lengthy and often hardly responsive while others were short, positive and emphatic, but a summation of the testimony given by each doctor was to the effect that the testator did not have testamentary capacity to execute a will on the date in question, which was the sole issue submitted to the jury. Proponents objected strenuously and many times to the questions propounded and the answers thereto on the grounds that the questions did not correctly state facts in support of the hypothetical inquiries propounded and that the questions propounded did not recite sufficient facts to warrant an opinion based upon a hypothetical inquiry. They further objected to the answers given because they were conclusions or opinions of the witnesses based upon insufficient data and because the questions called for a conclusion of law or a conclusion of mixed law and facts, and invaded the province of the jury. The opinion evidence given by the doctors was predicated generally upon hypothetical questions based upon contestants' claims to the effect that testator had been ill for some time with high blood pressure, which caused him to suffer a stroke on October 22, 1948, which resulted in his serious illness both mental and physical and kept him confined to his bed until he died on November 6, 1948. A careful examination of the statement of facts reveals that such claims were not supported by the evidence. The evidence reveals that testator was not well but was very active in carrying on a large part of his business all the time from the actual date he became ill on October 13, 1948, until the day before he went to the hospital on November 4, 1948, two days before his death. The evidence further reveals that he was not confined to his bed during that period of time but spent a part of the time visiting livestock sales at Vernon, Quanah and Crowell, buying cattle, visiting other places, paying accounts and enjoying visits with his friends and neighbors.

One of the three doctors who gave the expert opinion testimony had treated testator for influenza on April 23, 1941, but had not treated him professionally for anything before or since that date. Another one treated him about the same time for some sort of trouble and the third one treated him for some disorder some time in 1945, or 1946 or probably as late as early fall in 1948. But none of them had treated testator for the more recent illness that resulted in his death and none of them had seen him, so far as the record reflects during such illness.

The record reveals that the trial court in the instant case defined for the jury the term "testamentary capacity" as meaning sufficient mental ability at the time the will is executed to understand the business in which he was engaged, the effect of his act in making a will and the nature and extent of his property and he must be able to know his next of kin and the natural objects of his bounty and their claims upon him.

Ever since the leading case of Brown v. Mitchell, 88 Tex. 350, 31 S.W. 621, 628, 36 L.R.A. 64, was handed down by the Supreme Court on June 20, 1895, it has been the established law of this State that no witness, expert or otherwise, may testify to legal conclusions involving the capacity of a testator to make a will or to

perform any other act that the decedent actually performed. To permit such testimony invades the province of the jury and authorizes the witness to determine the very issue for the court and jury. In speaking there of the issue of the testator's mental capacity to make a will the Court said:

" 'This is a question of law, and not of medical science. It is for the jury, under the instruction of the court as to what is sufficient mental capacity to make a will, to decide on its existence or nonexistence when the will was executed from the facts testified to by the witness, and not from the witness' opinion regarding such facts. The jury, and not the witness, are to draw the conclusion from the facts stated by the witness. The opinion of a physician as to the existence of disease or a particular malady, and its effect upon the mind, would be evidence. But a physician's opinion regarding mental capacity generally, or the mental capacity necessary to make a will, is, in the eye of the law, no better than that of any other person.' "

■ It is our opinion that the admission of the testimony of the three physicians about which proponents here complain violated the well recognized rules of law announced in the Brown-Mitchell case. That case has since been many times cited with approval and the rules there announced have since been consistently followed. The case was cited by the Commission of Appeals in Pickering v. Harris, 23 S.W.2d 316, and Jones v. Selman, Tex. Civ.App., 109 S.W.2d 1003. The former case quoted at length from the Brown case. In the latter case a Doctor Crosthwait had been a regular attending physician of testatrix less than two months before she executed a will. Yet the court there held that the admission of opinion testimony given by Doctor Crosthwait, very similar to that given by the doctors in this case, was error. The court there discussed the matter at length and cited many authorities in support of its holding.

Proponents contend that there was no evidence of probative value to support the jury finding to the effect that testator did not have testamentary capacity on October 31, 1948, to execute the will in question and that such a finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong, unjust and unfair. The evidence will therefore be examined to determine the very question presented and not to determine the question of insufficiency of the evidence. The rules governing the question here presented should not be confused with the rules governing the question of sufficiency or insufficiency of the evidence. The question here presented requires an examination of all the legal evidence introduced to determine the answer thereto, which is a question of law. While in determining the question of sufficiency or insufficiency of the evidence, which is not the question here presented, only the legal evidence heard in support of the judgment must be considered, disregarding all the other evidence. This is a fact question governed by the rules of law. In re King's Estate (King v. King), Tex.Sup., 244 S. W.2d 660.

Testator, Ezekiel Bell, often called "Zeke" Bell for short, was a cattle man and farmer residing about 8 miles from Crowell where he had spent most of his life and was well known in that section of the country. He and his wife were temporarily staying in the Iris Tourist Court at Chillicothe for more than a week before he became seriously ill and was taken to the Quanah hospital on November 4, 1948, where he died two days later. The doctor in charge of the Quanah hospital certified that he attended testator from November 4, 1948, to November 6, 1948, and that the primary cause of his death was Cerebral Hemorrhage.

■ An examination of the statement of facts reveals that no witness testified that testator was of unsound mind on the day the will was executed or on the previous day when testator gave instructions about how he wanted his will made, while there is much positive and unequivocal testimony to the effect that he was rational and of sound mind on such dates as well as previous thereto and subsequent thereto

until the day before his death. The state of mind of the testator as to his sanity at times other than when he executed the will has no probative value except as it may tend to show the testator's state of mind at the very time he executed the will. Bell v. Bell, Tex.Civ.App., 237 S.W.2d 688, and other authorities there cited.

The evidence reveals that on October 30, 1948, at the request of testator, N. J. (Jack) Roberts, an abstractor at Crowell and a friend of testator for more than 50 years, together with Hubert Brown, mayor of the City of Crowell and another friend of testator of long standing, went together to see testator in Crowell. Upon their arrival testator told them he wanted his will prepared and asked Roberts, who had prepared many legal instruments for him previously, to prepare his will. Testator had been talking with Roberts prior thereto for four or five years about drawing a will for him. Testator there stated what he wanted done with each particular piece of property he owned and named every beneficiary designating what particular part of his property each should have. Roberts was well acquainted with the property owned by testator and knew that most of it had been acquired and paid for during his last marriage. Yet all of the matters pertaining to the preparation of the will were discussed at length during this visit which lasted approximately two hours. Testator wanted his will made and the property divided substantially in the same manner as he had suggested that it be done on every previous occasion when he discussed the matter with Roberts. The will was prepared exactly as requested by testator and on the following day, October 31, 1948, Roberts and Brown visited testator again in Chillicothe taking the will with them. On their arrival they found testator's brother, S. S. Bell, and his brother's wife visiting him. The will was there read in the presence of all of them and discussed for an hour or more one paragraph at a time. Testator discussed the terms of the will freely and expressed his satisfaction with it and declared it his last will and executed it in the presence of all of them with Hubert Brown and testator's brother,

S. S. Bell, witnessing the will at testator's request. Jack Roberts, Hubert Brown and S. S. Bell each testified positively to the foregoing facts and all of them testified unequivocally, based upon their long acquaintance with testator and his conduct for many years, particularly in connection with the execution of the will, that testator was rational and of sound mind when he executed the will and at all times prior thereto. Testator's brother, S. S. Bell, testified that he and his wife visited and talked with testator for several hours on that day during which time he was as rational and sane as he had ever been. At least three other witnesses, one a near neighbor of testator and his wife, visited him on the same day, October 31, 1948, and talked with him about matters of importance. Each of them testified, based upon their long acquaintance with him and their knowledge of his conduct, that he was rational and of sound mind during their visits on that day. A Methodist minister who was District Superintendent of the Vernon area and an acquaintance of testator of long standing visited him either on October 30 or October 31, 1948, and talked with him for some time. The said minister had performed the marriage ceremony when testator and his last wife were married in 1926 and he likewise conducted testator's funeral. He testified positively and unequivocally that testator was not well when he visited him yet he was rational, had a good memory, his conversation made sense and he was of sound mind. Several business and professional men and women who had known testator for many years testified about seeing him at various dates and places between October 22, 1948, and November 3, 1948, and having business transactions with him on such occasions. Based upon their acquaintance with him and knowledge of him, all of them testified that in their opinions he was of sound mind. During this period of time he visited the livestock sales barn at Vernon where he bought cattle and paid for them, drove his own motor vehicle taking two witnesses to another stock pen where testator cut out and graded the cattle as to uniform size that he wanted to buy (this

date being October 27, 1948). He likewise visited livestock sales at Quanah and Crowell where he made and had dealings with various witnesses who testified. On November 3, 1948, he visited a wholesale oil dealer in Crowell, paid his account in the sum of $250 and refueled his car at a service station. The men with whom he dealt here were witnesses in the case. On the date he checked out of the tourist court, November 4, 1948, and was taken to the hospital he gave his personal check to the operator of the tourist court in settlement of his account. All of these people with whom he had dealings gave testimony to the effect that he was of sound mind basing their testimony upon their acquaintance with him, and knowledge of his conduct and their dealings with him.

Dr. Raymond E. Sitta, a physician and chief of staff of Chillicothe Hospital, was called to the Iris Tourist Court to see testator professionally on November 3, 1948, before he died three days later. On that visit he counseled with testator 20 or 30 minutes, examined him and found his blood pressure was of natural range. Testator told him he had a leg that had been bothering him for about three weeks or a month. The doctor further testified that all the statements made to him by testator were rational and sane; that testator did not say anything on that occasion that would indicate he was irrational or of unsound mind and that in his opinion testator was of sound mind; that he saw testator brought into the Quanah Hospital on the next day, November 4, 1948, and spoke to him; that he visited with testator, though not professionally, in his hospital room on November 5, 1948, where he talked with him about how he was feeling; that from his conversation with testator and his observation of him he was of the opinion that testator was likewise of sound mind on November 5, 1948, the day before his death early next morning.

It will be observed that at least 14 witnesses talked with testator in close proximity to the time of his death and most if not all of them saw and talked with testator after the date fixed by contestants as the time when they claimed his serious illness began. Six of the witnesses, if not eight of them, saw and talked with him on the very day he executed the will. Others among his neighbors and associates gave testimony concerning his ill health but none of them testified that he was irrational or of unsound mind. The evidence generally showed that he was a man of strong conviction, positive in his statements and lived up to any commitments he made.

The only witness who gave testimony derogatory in any manner to the testimony heretofore stated was Alton B. Bell known sometimes as "Dink" Bell. He testified that he had known testator all of his own life and that he visited him on one occasion together with Arthur Bell and Hubert Brown. He did not fix the exact date of his visit other than to say positively it was not on October 31, 1948, the date the will was executed. Arthur Bell did not testify but he is the son of S. S. Bell, one of the subscribing witnesses to the will, and Hubert Brown, the other subscribing witness to the will, did not mention in his testimony any visit he made to see testator with Alton B. Bell and he was not asked about such a visit. Alton Bell stated at one time in his testimony that he visited testator only a few days before he died and at another time he testified that his last visit to see him was two or three weeks before the will was executed on October 31, 1948. He testified over objections of proponents that in his opinion testator was of unsound mind on the date he visited him. He based his opinion upon the related facts that apparently testator had some difficulty in swallowing ice cream being fed to him by his wife; that they talked about the crops and testator said he wasn't interested in them but the witness knew he was interested in his crops; and that testator said his left foot was bothering him considerably. He further testified that he had not visited in testator's home since he married his last wife or for a period of 22 years before he died and that he did not know when testator had visited in his home the last time. There is no evidence of his having been closely associated with testator for many years other than he had en-

gaged in a few business transactions with him during the past years. Proponents objected to the testimony of the witness concerning the lack of sanity of testator on the grounds that he had not given sufficient facts and circumstances upon which to base an opinion, particularly concerning the sanity of testator on the date the will was executed.

A nonexpert witness in such cases may express an opinion as to whether or not testator was of sound or unsound mind, provided the witness states enough related facts based on his knowledge of the testator's habits, conduct, expressions, peculiarities, disposition, temper or other such characteristics of testator to support a conclusion or opinion about the matter. It is our opinion that the facts related by the witness Alton B. Bell upon which he based his opinion to the effect that testator was of unsound mind on the date and occasion he visited him were insufficient to support his conclusion and opinion expressed and his opinion so expressed is therefore, as a matter of law, without probative value and should not have been admitted over the stated objections of proponents. His testimony likewise loses probative value because of the indefinite date according to his own testimony of his visit to see testator. For that reason his testimony would not have probative value sufficient to support a jury verdict when his indefinite statements were so contrary to the positive evidence heretofore stated concerning the issue of testator's testamentary capacity.

The opinions of expert witnesses, based upon hypothetical questions, which recited scattered incidents covering isolated and widely separated occasions, some of which purported facts are controverted and contrary to the overwhelming weight of the evidence and others very doubtful, have little, if any, probative value on the issue of testamentary incapacity and such alone will certainly not support a verdict as to positive and unequivocal medical and non-medical testimony in abundance to the contrary. Green v. Dickson, Tex.Civ.App., 208 S.W.2d 119, and other authorities there cited.

A testator may be weak and in poor health, but he still has a right to dispose of his property by will as he may desire, regardless of the ties of nature or relationship between him and those who may claim under his will. In such matters testator's desires should be respected if he knew what he was doing with his property and if his actions meet the test applied to people in the ordinary affairs of life. Jowers v. Smith, Tex.Civ.App., 237 S.W. 2d 805, and other authorities there cited. Testator's disposition of his property here made as reflected by the terms of the will may not be considered unnatural when we observe the record reflects that contestants, children by his first marriage, had visited their father very little, if any, since his second marriage and had not had much to do with him. Contestant L. D. (Darvin) Bell did not testify in this case and his sister, Mrs. Mary M. Todd, the other contestant, testified only briefly concerning the visit she, her husband, and her brother Darvin made to the hospital to see their father immediately before his death.

In the case at bar it is our opinion that there is no evidence of probative value showing or tending to show that testator did not have testamentary capacity to execute the will at the time it was executed but there is an abundance of evidence showing clearly that he did have testamentary capacity at the time the will was executed. In our opinion the finding of the jury is so against the great preponderance of the evidence that we are not willing to let the verdict stand. Navarro v. Garcia, Tex.Civ.App., 172 S.W. 723-724; In re Fowler's Estate, Tex.Civ.App., 87 S. W.2d 896, together with other authorities heretofore cited.

Proponents further contend that the District Court erred in its refusal to sustain their motion to dismiss the appeal and plea in abatement for the alleged reason that it had no jurisdiction to do otherwise because contestants, after announcing ready for trial, failed and refused to offer any evidence whatever in the probate court upon the alleged issues of lack of testamentary capacity and undue influence, the only

basis of their suit, and thus lost their right of appeal.

■ This identical question in this same action and between the same parties was before this court and disposed of in an opinion handed down on January 23, 1950, but was not released then for publication. Our judgment became final in the matter and it is our opinion that it becomes the law in the case in so far as this assignment of error is concerned. Because of this appeal and the issues here raised, our former opinion involving this same matter has recently been released for publication and will be found published in 245 S.W.2d 767, to which opinion and authorities there cited we refer now for consideration in support of our disposition made here of the same issue raised.

Our former opinion was based upon verified pleadings to the effect that no evidence was offered or heard in the probate court upon the only issues tendered by contestants' pleadings in support of their efforts to have testator's will and the order admitting it to probate nullified. However, we now have before us the testimony heard by the District Court upon proponents' motion to dismiss the appeal and the plea in abatement and the evidence there heard fully supports proponents' verified allegations upon which this court based and rendered its former opinion on January 23, 1950.

In the hearing upon the said motion to dismiss the appeal and plea in abatement had in the District Court on May 8, 1950, the evidence was not reported and transcribed by a court reporter but the probate judge, who had held such position 9½ years and who had previously heard the original action admitting the will to probate and had likewise heard the contest, both proponents and two of their attorneys all testified concerning the evidence heard at the latter hearing. The uncontroverted evidence there heard reveals that upon the hearing of this original action before the probate court the parties and their attorneys were present and both sides announced ready for trial when the case was called. Only one witness, contestant Mrs. Mary M. Todd, was presented by contestants and she gave oral testimony briefly concerning undisputed matters about the family history and nothing else, and a transcript of the record showing the admission of the will to probate in the county court was there introduced by contestants. No other evidence was offered. The probate court asked if there was any other evidence to be heard and contestants answered "No further evidence; that is all" and proponents offered no evidence. All of the five witnesses testified that no evidence was offered or heard in the probate court upon the issues of lack of testamentary capacity of testator or undue influence and such testimony given by the said witnesses was not controverted or denied by contestants.

■ We reiterate the holdings of the courts in the cases cited in our former opinion of date January 23, 1950, passing on the same question here presented. The court held in the case of Sorrell v. Stone, 60 Tex.Civ.App. 51, 127 S.W. 300, 301, writ refused, that a litigant had no right to appeal after voluntarily announcing ready for trial "upon an issue which he has presented, and then declines to offer any testimony in support of such issue" and that he loses the right of appeal "although such appeal might result in a trial de novo in the court to which the case would be carried by the appeal." In the case of Cannon v. Willis, Tex.Civ.App., 130 S.W. 2d 920, writ refused, a similar question was presented as that which had been presented in the Sorrell-Stone case and that has been here presented except that appellants tried in the Cannon-Willis case by a motion filed to take a nonsuit in the district court but the court overruled the motion for nonsuit and held that it had no jurisdiction other than to dismiss the purported appeal and cited and relied upon the Sorrell-Stone case and authorities there cited in so holding. Applications for writs of error were refused in both of the foregoing cited cases indicating that the rules of law there announced had the approval of the Texas Supreme Court. These rules of

law have not been overturned but still prevail.

The record before us reveals that contestants presented the issues of testamentary incapacity and undue influence by their pleadings filed in the probate court, voluntarily announced ready for trial but failed and refused to offer any evidence in support of the said alleged issues when the probate court heard the case and gave them an opportunity to offer evidence in support of their alleged issues. Based upon the record before us and the authorities cited it is our opinion that the District Court had no jurisdiction other than to hear and sustain proponents' motion to dismiss the appeal and plea in abatement and that it committed error in its refusal so to do.

But, be that as it may, proponents filed a motion for a peremptory instruction, after all the evidence had been heard in the case on its merits and both parties had rested, on the grounds, in effect, that there was no evidence of any probative value to support any issue pleaded by contestants and certainly there was no evidence of any probative value showing that testator was of unsound mind or did not have testamentary capacity at the time the will was executed but the overwhelming weight of all the evidence conclusively showed that he was of sound mind and did have testamentary capacity at said time. It is our opinion, for the reasons previously stated, supported by authorities previously cited, that the trial court should have sustained proponents' motion for a peremptory instruction for the reasons therein stated after having heard all the evidence in the action on its merits and should have rendered judgment for proponents. Having considered and passed on the material issues here presented and in view of our disposition made of them, we do not deem it necessary to pass on other assignments of error presented. For all of the reasons heretofore stated the judgment of the District Court is reversed and judgment is here rendered for proponents and to the effect that contestants take nothing by their alleged cause of action. Reversed and rendered.