**CHAMBERS et al. v. WINN et al.**

No. 13948.

Court of Civil Appeals of Texas. Fort Worth.

Sept. 22, 1939.

Rehearing Denied Nov. 24, 1939.

T. H. Yarbrough, of Bowie, and Berry, Warlick & Bunnenberg, of Vernon, for appellants.

Donald & Donald and Benson & Benson, all of Bowie, for appellees.

DUNKLIN, Chief Justice.

J. B. Turner, a resident citizen of Montague County, Texas, departed this life on September 2, 1934, leaving a last will and testament, dated June 13, 1933, in which all his estate was devised to Mrs. Della Winn. The will was admitted to probate in the County Court of Montague County, on the 18th day of September, 1934, and Mrs. Della Winn was appointed independent executrix, without bond, in accordance with the provisions of the will. On the 21st day of September, 1934, she and the appraisers theretofore appointed filed in the court an inventory and appraisement of the estate, which was approved by the county judge on the same day.

In the inventory and appraisement there were listed three tracts of land, situated in Montague County, of the aggregate appraised value of $1,200; also a one-half interest in four lots in the town of Bowie, Montague County, of the appraised aggregate value of $800; also personal property, of the aggregate appraised value of $914. There were also listed items of indebtedness owing by the estate, aggregating $796.

Turner's wife died some two years before his decease. They left no children, and the only lawful heirs of J. B. Turner were Lawrence Turner, a brother, Mrs. Florence Chambers, a sister, and Mrs. Dora Jones, a half sister. Those three were the only lawful heirs of J. B. Turner.

About one year prior to the death of J. B. Turner, Mrs. Della Winn and her husband began living with him in his home, and continued to live with him until his death. Neither Mrs. Winn nor her husband was in any way related to him.

On February 17, 1937, which was two years and five months (lacking one day) after the will was admitted to probate, Mrs. Florence Chambers and Mrs. Dora Jones, both widows, filed in the county court of Montague County their petition to set aside the order probating the will, on two grounds; first, because of lack of testamentary capacity of the testator to make a valid will, and, second, on the ground of undue influence exercised by the beneficiary upon the testator. Prior to the institution of the suit, Lawrence Turner assigned to Mrs. Florence Chambers all his right, title and interest in the estate, and her claim of right to the relief prayed for was asserted as an heir of J. B. Turner in her own right, and as assignee of her brother, Lawrence Turner. Mrs. Dora Jones' claim was by virtue of heirship as a half sister to the deceased. The defendants named in the petition were Mrs. Della Winn and her husband, Boyd Winn, both of whom were sued as individuals, and Mrs. Della Winn also as independent executrix of the estate of J. B. Turner.

The case was tried before a jury and at the conclusion of the evidence introduced, the court instructed a verdict for the defendants, and plaintiffs have appealed from a judgment rendered upon a verdict returned in accordance with that instruction.

Several assignments of error presented here relate to the admissibility of the opinions of non expert witnesses, to prove that J. B. Turner lacked testamentary capacity to make a valid will at the time he made it; no contention being presented that the will was not duly executed in accordance with the requirements of the statutes.

The will having been theretofore admitted to probate, the burden was upon the plaintiffs to sustain by a preponderance of the evidence the grounds upon which they sought a cancellation of the order probating the will. Howley v. Sweeney, Tex. Civ.App., 288 S.W. 602; 44 Tex.Jur. 574; Arts. 3433, 5534, Rev.St.

Article 8281, Revised Vernon's Texas Civil Statutes, reads as follows: "Every person aged twenty-one years or upward, or who may be or may have been lawfully married, being of sound mind, shall have power to make a last will and testament, under the rules and limitations prescribed by law."

As pointed out in 44 Tex.Jur., para. 15, p. 556, there is no statutory definition of what would constitute a "sound mind", within the meaning of that article of the statutes, and therefore a definition of that term is to be sought in the decisions of the courts; with the further observation that the term "sound mind" is used in the decisions as synonymous with "capacity," "competency" and "testamentary capacity," and on page 558 this is said: "While the definitions of 'sound mind,' 'competency' and 'capacity' vary not a little in phraseology, an analysis of the language employed shows that the determination of the issue as to testamentary responsibility invariably depends upon the showing as to whether the decedent understood or appreciated the consequences of executing the propounded script." Citing numerous cases, including Brown v. Mitchell, 75 Tex. 9, 12 S.W. 606.

And in paragraph 17 of the same page, this is said: "To have appreciated the consequences of executing the propounded instrument, the decedent must have taken cognizance of certain facts or conditions; and he must have understood the effect of the provisions of the script in respect of these facts. More precisely, the decedent must have had in mind (1) his property, and (2) the persons who had claims upon his bounty and whose interests are affected by the provisions of the instrument." With citations of numerous cases, including Morris v. Morris, Tex.Com.App., 279 S.W. 806, which was adopted by the Supreme Court, with an express approval of the reasonings advanced. In that case it was announced that one of the essential elements necessary to show testamentary capacity of the testator is that he must have been cognizant of the claims of persons to whom the estate would pass by inheritance in the absence of a will devising the property to one who is not his heir.

In 44 Tex.Jur., par. 35, page 576, this is said: "The right to dispose of property by will 'is not to be defeated by adverse findings of juries upon the issue of testamentary capacity based upon evidence which does not fairly support such findings.'" Citing Stell v. Salters, Tev.Civ.App., 83 S. W.2d 742.

And, further: " 'The trend of appellate courts of our state, as well as those of others, is to hold that the tendency to assail last wills of the aged and enfeebled upon the grounds of mental incapacity, and by frivolous and inconclusive evidence, chiefly of a speculative character, has grown to such an alarming extent in late years that it should be checked.'" Citing McCannon v. McCannon, Tex.Civ.App., 2 S.W.2d 942, 949, error dismissed.

Numerous authorities might be cited holding that lack of testamentary capacity may be proved by the opinions of non expert witnesses, based upon their observations or knowledge of the habits, conduct, expressions, peculiarities, disposition, temper or character of the testator, and who have had sufficient opportunity to acquire such knowledge, and after stating the facts of their own knowledge upon which they base their opinion. 44 Tex.Jur., par. 41, page 583, and many authorities there cited, including Applegate v. McFadin, Tex. Civ.App., 20 S.W.2d 396, 398; King v. King, Tex.Civ.App., 91 S.W.2d 511, error dismissed; Brown v. Mitchell, 88 Tex. 350, 31 S.W. 621, 36 L.R.A. 64.

Whether evidence is relevant and admissible is a question of law to be determined in each case by the trial court, and the test of its admissibility to prove any particular fact is whether it is capable of affording any reasonable presumption or inference as to the matter in dispute, and the rulings of the trial judge in that regard will not be disturbed, in the absence of a showing of abuse of discretion. 17 Tex. Jur., par. 114, page 348, par. 105, p. 336; 19 Tex.Jur., par. 92, page 135; 3 Tex. Jur., par. 760, p. 1079; 1 Tex.Jur.Supp.1937, p. 310, sect. 760; 22 C.J. par. 700, 701, pp. 607–609. It is also the rule that evidence which is too vague and indefinite to have any probative force, or which is too uncertain to form a basis for any conclusion as to the matter in controversy, should be excluded. 17 Tex.Jur., par. 112, page 344; Kellogg v. McCade, 92 Tex. 199, 47 S.W. 520.

Mrs. Florence Chambers testified that she is a widow, 66 years of age, living in Amarillo, Texas, has five children, has no property, but is supported in part by a daughter and a son. The deceased, J. B. Turner, was two or three years older than the witness; the deceased knew of her financial circumstances at all times.

Plaintiff Mrs. Dora Jones testified that she was 54 years of age, a widow, had 14 children, lived on a farm in Randall County, Texas, before and at the time of the death of J. B. Turner, but was in poor

financial condition, which was known to the decedent.

Mrs. Cora Estes, a cousin of J. B. Turner, testified that some 35 years ago she lived in Montague County, and knew J. B. Turner all her life; both lived in Bowie, near-neighbors for several years, and each visited in the home of the other quite often; some of his visits to her home would extend over two or three days. Witness had occasion to observe the appearance and demeanor of J. B. Turner, and his mental condition and the condition of his health before and after his wife's death. After the death of J. B. Turner's wife and after he had made a will, which was some six months before he died, witness had a conversation with him, in which he told witness: "I want to tell you something. I made my will. * * * I made it and I want my two sisters and my brother to have everything I have. I have made my will that way. Of course, if Mrs. Winn takes care of me I am going to pay her for it. I have made my will so my two sisters and brother will have everything I have." Testator had a spell of illness before his wife died, and one after her death. After his wife's death, he went to a hospital and had an operation. Witness observed his mental condition from the time his wife died up to the time he made the statement attributed to him, above set out, and his mental condition remained the same during all that period.

Mozine Jones Raten, daughter of Mrs. Jones, eighteen years of age, and married, was introduced by the plaintiff, and testified that she had known the testator all her life, but had not seen him often until the last four years of his life, and about four or five times after his wife's death. He had frequently visited in the home of witness' mother, his visits lasting several days, and witness was frequently in his company. Testator took the family from Vernon to Plainview right after his wife died, a distance of about 170 miles. The testator made a statement to witness about the way he was leaving his property, or intended to leave it. That statement was made at witness' home in Plainview during the latter part of 1932. "Q. Tell us what was said. A. I asked him about a piano that he promised us and I asked him if he was going to give it to Mrs. Winn, and he said, no, Mrs. Winn didn't get nothing but what she could get off the place, and when his will was made it was made to his brother and sisters." On

cross examination she testified the conversation might have been in the first part of the year 1933, but it was after the Winns had moved into the home of the testator. Witness further testified that when testator visited in the home of the witness she noticed his physical appearance. "He didn't know us kids apart at all; he didn't look well; he looked bad; he weighed less; his face was awfully wrinkled; he had an awfully sad expression on his face." There was a difference in his physical appearance before his wife died and afterwards, although she had not seen him much before his wife died.

"Q. Did you notice any change in his appearance? A. I did.

"Q. Was it for good or for the worse? A. Worse.

"Q. Did you notice any peculiarities about the way he acted or the way he did? A. Yes, the way he would talk to us. He would speak of some old friend and he would break down and cry and almost have a nervous breakdown, it seemed like. That was after his wife died. He didn't have any memory at all hardly when he was there at our house; he would be doing one thing and he wouldn't have his mind on it at all. He said he couldn't keep his mind on things; he couldn't do the things he wanted to; he couldn't keep his mind on things; did not recognize the children; would confuse their names; could not talk for any length of time on any particular subject."

From the observations of him and conversations with him while he was around witness, she formed an opinion as to whether or not he was of unsound mind, and in the opinion of the witness he was of unsound mind. After his wife's death he was not capable of knowing and appreciating the nature and consequences of his acts. The last trip testator made to witness' home was just before he died; at that time witness was 13 or 14 years old; at that time witness lived in Plainview and testator lived in Bowie. There were 14 children in the witness' home.

The testimony above is followed by a notation in the statement of facts that the jury then returned into the court, but just how much of it was introduced during the jury's retirement does not appear. However, the record shows that testimony substantially to the same effect was repeated in the presence of the jury and admitted

over the objection of the defendants' counsel.

Following the introduction of that testimony the witness was further questioned, during another retirement of the jury. After their return into court, the witness was again questioned and testified that the statements of the testator, with reference to what Mrs. Winn was going to get, and that when he died he expected his property to go to his brother and sisters, occurred in June, 1934, after witness was out of school in May and before the testator died in the following September.

The court then sustained the defendants' motion to strike out the testimony of the witness as to that conversation, with reference to what Mrs. Winn was going to get, because it was 10 or 11 months subsequent to the execution of the will, to which counsel for plaintiffs excepted, stating at the time that that testimony was offered as a circumstance to show the mental condition of the testator at the time of the execution of the will.

W. C. Sauls, another witness for the plaintiffs, testified that he had known J. B. Turner about 25 or 30 years before his death, and lived in Bowie just across the street from where J. B. Turner had lived for six or seven years. He and the testator had visited in each other's home many times and had many conversations with him, and also many dealings; he had visited with him before and after his wife died. Testator had high blood pressure pretty bad, but never had any sickness that he knew of. On one occasion testator had a spell of sickness at witness' house, just before his wife died. At that time testator had a fainting spell and witness and his wife revived him by shaking him and throwing water in his face.

"Q. State what change you noticed. A. Well, I just noticed he wasn't like he was, because he told me when we was fishing one day, he said, 'Billy I'm liable to have a spell and I'm going to show you how to stop this car.'

"Q. Did he say what kind of spell? A. Well, after that, he had spells that I would call wasn't right.

"Q. Did he tell you how it affected him? A. Yes.

"Q. How did he say it affected him? A. Well, just like the spell he had at my house.

"Q. Did he lose consciousness when he was at your house? A. No, sir, he didn't know nothing.

"Q. Did he say or do anything, after his wife's death, in your presence, which was out of the way? A. Yes, sir.

"Q. Tell the jury what he did. A. He came to my house one morning and said, 'Billy, do you want to go fishing? And I said, 'I don't care.' I would go, and we went to town and stopped to get some fish bait, and he said, 'Billy, give me a nickel,' and I said, 'Ben, I haven't got a nickel,' and I went in there and got some fish bait and he just sung all the way; he never said a word, and when we got to the tank he grabbed up the fishing poles and bait and went right on to the tank and never said a word to me. I had my own fish bait; I had fish bait that I generally used and along that evening about three o'clock he came down there where I was, and cut off a piece of beef and says, 'Here is a piece of beef. You can try that.' I knew good and well Mr. Turner never did make no such a break as that and we had been together time and again.

"Q. How long was that before his death, do you know; about how long? A. It was maybe a month or two.

"Q. Maybe a month or two after his wife's death? A. Yes, sir."

Witness further testified that after the death of testator's wife and before the Winns came to live with him, he borrowed some money from the testator and was dunned frequently for it; that he had borrowed money from him before and was never dunned for the loan. He was not as healthy after his wife's death as before. After his wife died he visited witness' home frequently and witness noticed a change in his mental condition. He further testified that he had occasion to observe the conduct and demeanor of Mr. Turner from the time of his wife's death until his death.

"Q. Do you know, from your observations and the things you have told us about, and your knowledge of the nature and character, and your acquaintance with the man, whether or not he was of sound or unsound mind on the 13th day of June, 1933?

"Mr. Benson: We object to that.

"The Court: Sustain the objection.

"Mr. Bunnenberg: Note our exception. We would like to have the bill show what his answer would be.

"Mr. Benson: We will say that he would say that he was of unsound mind."

Lamar Jones, also introduced as a witness for the plaintiff, testified that he lived in Plainview; was a son of plaintiff Mrs. Dora Jones, and lived with her; remembered the time when J. B. Turner's wife died; he had seen him several times before the death of his wife, and some three times thereafter, during his visits in the home of witness' mother, in 1932, 1933 and 1934. His visits usually lasted some two or three days. Witness also visited in J. B. Turner's home before the death of his wife, and once thereafter, in the year 1934. In the year 1934, J. B.Turner told witness he had brought Mr. and Mrs. Winn down to live with him, and that they were to have what the place made as long as he lived, and after his death it would go to witness' mother and aunt. About the first of May, 1932, he made practically the same statement to the witness, saying that at his death he would will his property to witness' mother and Aunt Florence and uncle; that was before Mrs. Winn came to live with him. That statement was made about the first of May, 1932; during the visits of J. B. Turner in the home of witness' mother, witness observed his physical condition; he acted more like a small child; just looked like he was in a strain all the time, like something worried him; it seemed like something was bothering him all the time; he had lost weight at that time; prior to the death of his wife, he seemed to be healthy, but in pretty poor health after his wife died. When he would talk about his old friends he would cry about it, sit around with his shoes off, complaining of his feet burning up, and hold them in water. He would start a conversation on one subject and change; confused the names of the children, calling them by wrong names.

"Q. Based upon the things he said, and the things he did, and your observation of him, and your acquaintance with him, state whether he was of sound or unsound mind on June 13, 1933.

"Mr. Benson: We object to that for the reason it isn't shown this witness has any knowledge or any means of knowing his mental condition at that time, or anywhere near that time; for the reason, this being a lay witness, he has not detailed sufficient facts or circumstances tending to show any unsoundness of mind on the part of testator; for the reason that the question is based not only on matters testified about by the witness but additional matters not testified to by this witness, and therefore not proper as a basis for his answer.

"The Court: I will excuse the jury."

Thereupon, the court excused the jury and in their absence the witness was permitted to answer as follows:

"A. No, sir.

"Q. Do you mean he was of unsound mind? A. Yes, sir."

Defendants' objection to that answer was thereupon sustained and plaintiffs excepted.

Maura Carpenter was also introduced as a witness for plaintiff. According to her testimony she had known J. B. Turner practically all her life, and had lived in Bowie seventeen years, about a block distant from J. B. Turner's home. Turner had lived in Bowie some ten years before he moved to his farm, which move was about a year before his death. His wife died about six months before he moved to the farm. Mrs. Winn and her husband began living with him before he moved to his farm; they lived with him in his house. Witness had seen J. B. Turner practically every day and had talked to him frequently, after his wife's death. He came to witness' house early one morning to listen to a program over the radio, and after listening a while, and while witness had excused herself to wash dishes, he got up and left, apparently offended, which was queer because he had never acted that way before. At the time of his wife's death he told witness he had to borrow some money to put his wife away, and in about three weeks thereafter he told her that he had enough to live on if he lived to be 100 years old. After his wife's death he always looked awfully bad to what he did before her death; did not seem happy. After his wife's death he had high blood pressure or Bright's disease or kidney trouble; would tell the witness about how he walked the floor and stayed with his feet in the tub all night, because they bothered him so bad. His physical condition grew worse after his wife died; he said he was going to get the Winns to come and live with him, but nothing further on that subject.

"Q. Now, based upon the things you have testified to about Mr. Turner, and your observations of Mr. Turner's condition after his wife's death, and before he moved to the farm, and based upon your acquaintance and your observations

and your knowledge of the habits and nature of Mr. Turner, would you say that he was of sound or unsound mind at that time?"

To that question defendants' counsel objected, on the same grounds urged to the other testimony, already noted, and the objection was sustained. If permitted to do so the witness would have answered that in her opinion J. B. Turner was of unsound mind.

The witness, Mrs. Cora Estes, was then recalled by plaintiff and testified that after his operation and before his wife's death he cried quite a lot, seemed nervous and could not remember anything, and his wife always had to attend to his business affairs thereafter. Anyone who asked to borrow money from him could get it.

"Q. From all your conversations with him, and from the things you have told us about what he did and said, and from your acquaintance with the man, his nature and habits, and his physical condition, state whether on June 13, 1933, J. B. Turner was of unsound mind.

"Mr. Benson: We object to that for the reasons heretofore set forth. This witness hasn't detailed any circumstances and we submit this witness hasn't formed any basis for any such testimony.

"The Court: I will sustain the objection."

If permitted to answer the question the witness would have answered that J. B. Turner was of unsound mind on June 13, 1933.

After the court had sustained defendants' objections to the proffered testimony of the witnesses above shown and plaintiffs had excepted thereto, plaintiffs rested their case. The defendants then moved for an instructed verdict in their favor, without introducing any testimony and that motion was granted.

At the outset it is proper to note that the evidence offered was wholly insufficient to sustain the allegations in plaintiffs' petition that the execution of the will was induced by undue influence exercised by either of the defendants. So the only question to be determined here is whether the testimony offered and excluded was admissible to prove lack of testamentary capacity of the testator to execute the will at the time of its execution.

One of the grounds of defendants' objections to the purported statements of the testator to the different witnesses to the effect that he had not devised or did not intend to devise any of his estate to Mrs. Winn, but intended to pay her for her services to him while in his home, and to will all his property to plaintiffs and his brother, was that they were no part of the res gestae of the execution of the will, and were therefore objectionable as hearsay.

That proof of such statements was not admissible to prove lack of testamentary capacity, we believe is settled by the decision of our Supreme Court, in opinion written by Judge Critz, in Schelb v. Sparenberg, 124 S.W.2d 322.

Nor did those statements, of themselves, tend to show unsoundness of mind. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138.

It is well settled that a lay witness may testify to his opinion that a testator was of unsound mind at the time of execution of his will, if he has been in sufficient personal touch with the testator to enable the witness to form such an opinion, provided he testifies to the facts or circumstances on which his opinion is based. Duckels v. Dougherty, Tex.Civ.App., 226 S.W. 720; Campbell v. Campbell, Tex.Civ. App., 215 S.W. 134, error refused; Stell v. Salters, Tex.Civ.App., 83 S.W.2d 742.

That rule necessarily and logically implies that those facts and circumstances on which the opinion is based are relevant and reasonably tend to show mental unsoundness. An announcement of this rule is found in Smith v. Guerre, Tex. Civ.App., 175 S.W. 1093; Stell v. Salters, Tex.Civ.App., 83 S.W.2d 742; Colvard v. Goodwin, Tex.Civ.App., 24 S.W.2d 786; 24 TexJur., par. 45, p. 430, and authorities there cited.

As already stated, the declarations of the testator as to his intention to will his property to his brother and sisters were inadmissible.

The rulings of the trial court, to the effect that the other acts, conduct and statements of the testator, detailed by the several witnesses as further reasons for their conclusions that the testator was of unsound mind, were also inadmissible, have ample support in the authorities last cited.

Those matters have been set out above, and it is unnecessary to repeat them. It is sufficient to say that the statements and conduct attributed to the testator by those witnesses (other than those concerning the devise of his property already held inad-

missible), such as failing health, expressions of grief for loss of his wife and old friends; confusion of names of the several children of his sister when he visited in her home; faulty memory, physical appearance, loss of weight, efforts to collect loan, statements of his financial condition, etc., were matters of common experience of persons of normal mentality and did not reasonably tend to support the proffered opinions of any of those witnesses that J. B. Turner was of unsound mind at the time he executed the will in controversy, even if their observations were not too remote from the date the will was executed, contrary to what we are inclined to believe was true of some of them, to say the least. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059.

Those matters being thus eliminated as qualifying those witnesses to testify that in their opinions testator was of unsound mind, such opinions were without a sufficient predicate for their admission. And since the burden was upon plaintiffs to overcome by a preponderance of evidence the previous judgment of the probate court, decreeing that the testator was possessed of testamentary capacity when he executed the will, the trial court did not err in excluding those opinions.

It is hardly necessary to add that unless J. B. Turner was of unsound mind when he executed the will, the absence of his kinship with Mrs. Winn would not of itself be a sufficient ground for annuling it. And in this connection it is to be noted that the testimony of plaintiffs' witnesses suggests that after the death of testator's wife, he had need of the services of Mrs. Winn to care for him and his home, and which she did render up to the date of his death, thus suggesting a probable motive on his part to compensate her therefor by making her beneficiary of his estate. And in none of the testimony offered by plaintiffs was there any showing or suggestion that testator's brother or either of his sisters had offered to perform any of the services rendered by Mrs. Winn, or had ever contributed in any manner or at any time towards his welfare or comfort.

Many authorities are cited by appellants, which announce the general rule that opinions of non expert witnesses on the issue of testamentary capacity are admissible because it is impossible to portray to the jury the mental impressions of the witnesses on which those opinions are based. But those decisions all recognize the rule that the facts and circumstances on which those opinions are predicated must first be testified to in order to qualify the witness to state such opinion. Hence, a review of the facts involved in those cases could serve no useful purpose here, and will not be undertaken.

Accordingly, all assignments of error are overruled, and the judgment of the trial court is affirmed.