## In re BOULTINGHOUSE'S ESTATE.

### No. 5000.

Court of Civil Appeals of Texas.

El Paso.

April 7, 1954.

Rehearing Denied April 28, 1954.

Kemp, Smith, Brown, Goggin & White, El Paso, for proponent.

Guinn & Guinn, El Paso, for contestant.

McGILL, Justice.

This is a will contest case. In the trial court appellant was the proponent of the alleged will of Susan E. Boultinghouse, deceased, dated October 22, 1951, and appellee was the contestant. Mrs. Boultinghouse died on January 16, 1952. Application for probate of the alleged will was filed on January 17, 1952 in the County Court of El Paso County. Contestant filed a contest of this application on the ground that the deceased did not have testamentary capacity. Trial before the county judge resulted in a judgment admitting the instrument to probate. An appeal was taken by the contestant to the 65th Judicial District Court of El Paso County, where trial was to a jury. In answer to the only issue submitted the jury failed to find that at the time Susan E. Boultinghouse signed the instrument offered for probate, dated October 22, 1951, she had testamentary capacity. In conformity with this verdict the court denied probate of the instrument and proponent perfected her appeal to this court.

Appellant's first point is that Susan E. Boultinghouse as a matter of law had tes-

tamentary capacity at the time of executing the instrument offered for probate as her will dated October 22, 1951, and her second point is that the finding of the jury that she did not have such testamentary capacity was contrary to the weight of the great preponderance of the evidence.

The instrument was prepared by Mr. James F. Hulse, an attorney. He testified that the testatrix came to his office and gave him the information from which he prepared the will; that so far as he recalled she had no notes or memoranda, but gave him the description of the property mentioned in the will without reference to any memorandum so far as he recalled, and that he had obtained the information from no other source; that he prepared the will in accordance with her instructions by dictating it to his secretary, Mrs. Horton, and instructed her when she had it typed to give it to his partner, Mr. Schuyler Marshall, to check for errors, and then to phone the testatrix and have her come to the office to execute the will. Mrs. Horton testified that she typed the will as dictated to her by Mr. Hulse, submitted it to Mr. Marshall and called Mrs. Boultinghouse, as instructed by Mr. Hulse, and that Mrs. Boultinghouse came to the office and she took her in to Mr. Marshall's office, where she read over the will and signed it in her presence and the presence of Mr. Marshall. Mr. Marshall testified to the same effect. Both Mr. Hulse and Mr. Marshall, and Mrs. Horton, further testified that they noticed nothing unusual or abnormal about the testatrix, that she seemed to be capable of knowing and did know exactly what she wanted in her will and discussed the matter in a businesslike manner. We here reproduce the instrument in question:

"The State of Texas }
County of El Paso }

"Know All Men By These Presents: That I, Susan E. Boultinghouse, the widow of Charles M. Boultinghouse, of El Paso County, Texas, being in good health and of sound and disposing mind and memory, do make and publish this, my last will and testament, hereby revoking all wills by me at any time heretofore made.

"I.

"I direct that all my just debts including those incident to my last illness and interment shall be paid out of my estate as soon after my death as my hereinafter appointed executrix shall deem convenient and proper.

"II.

"I give, devisee and bequeath unto my friend Dorothy Ann Bailey, of El Paso, Texas, the following described property, towit:

"Lots twenty-six (26) and twenty-seven (27) in Block One Hundred Six (106), of the Highland Park Addition to the City of El Paso, El Paso County, Texas, which property is also known as No. 2713 Altura Boulevard, El Paso, Texas, together with all the furnishings and personal property therein at the time of my death.

"III.

"I give and bequeath unto my beloved friend, Margaret Holloway, of El Paso, Texas, my diamond ring.

"VI.

"I give, devise and bequeath all of the rest and residue of my estate, real, personal, and mixed to my cousin Margaret Fickling, of Lynwood, California. This residue includes, but is not limited to (1) my new home described as Lot One Hundred Ninety-nine (199) in Block Twenty-three (23) of Second Section of Loretto Place Addition to the City of El Paso, El Paso County, Texas, which property is also known as No. 616 Sierra Road, El Paso, Texas; (2) any bonds I may own at the time of my death; and (3) the balance due on a promissory note payable to me, signed by Cecil Brunk. I particularly direct my executrix to collect the balance due on this note, and to pay over the proceeds thereof to said Margaret Fick-

ling, as I desire said proceeds to go to her.

"V.

"I appoint Dorothy Ann Bailey to be the sole and independent executrix of this my last will and testament and of my estate, and direct that no bond or other security be required of her in such capacity, and that no proceedings with reference to this my last will and testament or my estate be had in any court other than to probate this my last will and testament and to file an inventory, appraisement and list of claims as the law directs.

"VI.

"I request my executrix Dorothy Ann Bailey to request J. F. Hulse to render all legal services required in connection with the probating of this will and the administration of my estate.

"In Testimony Whereof, I have executed this instrument, at El Paso, Texas, on this the 22 day of October, 1951, in the presence of Schuyler B. Marshall and Gladys Horton who, at my request and in my presence, and in the presence of each other have signed their names hereto as attesting witnesses.

"/s/ Susan E. Boultinghouse
"Testatrix

"The foregoing instrument consisting of two pages, including this page, was signed by the Testatrix Susan E. Boultinghouse, and she declared the same to be her last will and testament, and we, at her request and in her presence and in the presence of each other, sign the same as attesting witnesses this 22nd day of October, 1951.

"/s/ Schuyler B. Marshall
"/s/ Gladys Horton."

We now summarize the evidence on which appellee relies to sustain the jury verdict as reflected by her brief: Susan Boultinghouse had suffered from a vicious disease since 1945 and probably for a longer period. This disease was arterio

sclerosis; that the effects of this disease are not easily seen and only noted after much damage has been done to the brain; that one does not recover from it, but it destroys brain cells which are never replaced, and becomes progressively worse; that in addition to this cerebral arterio sclerosis, deceased was suffering from high blood pressure, hypertension, and was diabetic, which aggravated her mental deterioration; that the deceased had been a fine bookkeeper before the disease destroyed her faculties and rendered her unemployed and unemployable; she had been an agile woman and a good conversationalist, an excellent cook and an adept bridge player; had earned and saved and cared for her property; had painted pictures and done works of ceramics; had been a noted penman and had kept books for the Acme Laundry where her work was regarded as "pretty as a picture"; she had handled her legal affairs in good order; she was an expert driver and cared for her car; she travelled about the country and visited back and forth with her only kin, the appellee, who lived in California; she had fine taste and manners, cared for her personal grooming and health; had been a capable business woman, self-sufficient and independent; that because of the disease she began to change more and more. Her own physician diagnosed her trouble in 1945 and her friends noticed her change until the disease took her in a "severe vascular accident"; that she was in almost a pathetic state for months before the will was executed; she could no longer keep books or even keep her own personal transactions straight; she could not write a check properly or make out a receipt or fill in blanks of a promissory note; could not address a package for mailing; she was constantly falling, with strokes which caused her to have a momentary loss of consciousness; she could no longer cook; she was no longer the life of the party and she could not even carry on a simple conversation with longtime friends, but would lapse into a silence in the middle of talk, stare into space for several minutes until brought out of her spell. She would commence one subject of conversation while right in the middle of another; she could

no longer paint or work with ceramics; her writing looked like chicken tracks; she abused her automobile and drove in a wild and reckless manner; she would leave it at night in the driveway with the doors ajar, the lights turned on and the key in the ignition switch; she fell into bad manners, described as those of a little, untrained child; she thought it amusing to spit food on her friends; she sat with her dress up high and not covering her limbs; she refused to pull window shades; she made revolting noises and washed her dentures under the kitchen faucet in full view of the dining table; she would eat directly from the serving plates at the table; she could not dress herself so as to get on matching shoes or earrings; she could not add or subtract; she made lavish gifts to those who were better off than she and exhausted her cash assets to the amount of $24,000 in twenty-seven months; although she was just sixty-two years of age; that she had spells of hysteria and crying within two days of the execution of the will in question; that although she had been warned by her physician against doing so she continued to eat ice cream, and that on one occasion she was covered from head to foot with orange juice that had time to dry out. There was medical testimony that the greater the brain damage the worse such a person would walk, and evidence that on the very day the will in question was executed Mrs. W. K. Burrus saw her come "wabbling" down the street and helped her up on the curb; that she was wabbling so much that she, Mrs. Burrus, thought perhaps she was intoxicated.

We add that a careful and painstaking reading of the statement of facts, which is lengthy, containing 567 pages and consisting of two volumes, reveals that the deceased, although she was 62 years of age and had difficulty in raising herself out of a chair, began taking dancing lessons. Also that testatrix had executed two other wills, one on July 25, 1950, which was prepared by J. F. Hulse and witnessed by him and Gladys Horton, by which she had devised to contestant all of her estate, real, personal or mixed, wherever located, in fee

simple; and one prepared by R. E. Crawford, an attorney and justice of peace, which was executed in August of 1951 and by which she devised her home on Sierra Road to Cecil Brunk and his wife, Margery Brunk, and a ring which she states will be found in her safe to Cecil Brunk, and directed that a debt in the amount of $2,000 or any unpaid portion thereof at the time of her death, which was evidenced by a note signed by Cecil Brunk and his wife, should be cancelled, and devised the property on Altura Boulevard to contestee and the rest and residue of her estate to contestant.

The court charged that:

"By the words 'testamentary capacity' is meant that the person making the will must, at the time the will is executed, have sufficient ability to understand the business in which she is engaged, the effect of her acts in making the will, the capacity to know the objects of her bounty, and their claims upon her, and the general nature of her property."

There is no contention that this charge was erroneous.

When we view the evidence in the light most favorable to the verdict we are well satisfied that there was some evidence of probative force to raise the issue of testamentary incapacity. The evidence is fully as cogent as that held to be sufficient to raise the issue in Chambers v. Winn, 137 Tex. 444, 154 S.W.2d 454. See opinion of Court of Civil Appeals, 133 S.W.2d 279. Therefore, the court did not err in failing to direct the verdict and in submitting the issue of testamentary capacity to the jury.

▇ The burden was upon the proponent to establish testamentary capacity by a preponderance of the evidence in order to obtain probate of the will. She failed to secure such finding of testamentary capacity, although as we have held, the issue was raised. Therefore, the court rendered the only proper judgment that could have been rendered.

The question that has given us most trouble is whether the evidence so preponderates against the verdict and judgment that it should not be permitted to stand. An exhaustive examination of the authorities has revealed no case where the facts as to testamentary capacity are controlling in this case. Chambers v. Winn, supra, and Bell v. Bell, Tex.Civ.App., 237 S.W.2d 688, and Navarro v. Garcia, Tex.Civ.App., 172 S.W. 723 are the nearest we have found. In determining this question we must of necessity consider all the evidence, although an expression to the contrary may be found in First Texas Prudential Insurance Company v. Sorley, Tex.Civ.App., 272 S.W. 346, wr. ref. At the time the opinion was written an unqualified refusal of a writ did not signify that the Supreme Court approved the opinion of the Court of Civil Appeals. Also, it will be noted that the jury did not find that testatrix lacked testamentary capacity. As above pointed out, they failed to find by a preponderance of the evidence that she had testamentary capacity.

It is our considered judgment that the overwhelming weight of the evidence of probative force so preponderates in favor of testamentary capacity of Susan E. Boultinghouse at the time she executed the will in question and against the answer of the jury to the questions submitted that the verdict and judgment should not be permitted to stand.

Under the circumstances the will was not an unnatural will. There was evidence that testatrix had visited the contestant, her cousin and only blood relative, in California prior to the execution of the will in question, and on this occasion she was led to believe that contestant did not desire to have her live with her in her apartment. Testatrix would naturally resent this attitude of contestant toward her. Also there was evidence that the Brunks had become tired of testatrix' association and constant visits with them, and had ceased to invite her to their home as they had formerly done. Testatrix would naturally resent this attitude of the Brunks, hence it is quite natural that she should have changed her prior will as she did.

There were two medical witnesses, Dr. Joe C. Carter, who had attended Mrs. Boultinghouse since 1945, and Dr. Raymond Bennett, a psychiatrist who had never seen her but testified in answer to the hypothetical questions propounded to him. Dr. Carter testified that he had diagnosed Mrs. Boultinghouse's trouble as hypertension or high blood pressure, which had a tendency to produce a sclerosis, or arterial sclerosis of the arteries of the body, and diabetes; that she had this condition when he first examined her in 1945, and that this condition had a tendency to rupture or clot blood vessels of the brain and when once destroyed the brain cells could not be restored, and that ultimately such condition would lead to a softening of the brain and result in a severe stroke. He described these attacks which resulted in forgetfulness, dizziness and temporary loss of memory as attacks of Alvarez. He also attended Mrs. Boultinghouse during her last illness when she had a severe stroke, to which she succumbed. However, on cross-examination Dr. Carter conceded from questions propounded to him that a person suffering from such attacks of Alvarez might recover from such attacks to the extent that they could go back to work and take care of their business affairs in a normal manner; that quite a number of them did so; that Mrs. Boultinghouse undoubtedly knew what she was doing at the time she executed the will in question, that is, she knew what property she had and she knew the individuals to whom she wanted to give it, and that she had in mind her cousin, appellee, at the time; that she talked to him in a normal manner when he saw her on the 12th of September, 1951; that as far as his dealings with her were concerned she was more or less always normal when he saw her, even up to the last time when he saw her during her last illness; that she did complain of forgetfulness and fogginess and dizziness; that she told him that she would get spells and then they would pass away and then she would feel just like she

always did. Dr. Bennett's testimony may be summarized by the following quotation:

"Well, from the information given me of the individual's behavior and the type of ailment she had and over how long a period she had, and her death soon after this Will was made, I would feel that she knew she wanted to make a Will, that is true, she wouldn't have gone ahead—or would have done it, but I am very skeptical as to whether she realized the effects of this Will, because from the symptoms that you have given me she showed disorientation, confusion, forgetfulness and a rather advanced stage of deterioration, therefore I do not feel that she could use proper judgment."

The writer having served as County Judge of El Paso County for some ten years feels that it may be that he has probably come to regard the wills of deceased persons as more sacred than the average attorney or judge. For this reason he has urged his associates to give most careful and critical consideration to this opinion. They have done so, and are in full accord, hence the judgment will be reversed and the cause remanded for another trial.

Appellant's other eighteen points, with the exception of the third point, complain of improper admission of testimony. The testimony complained of is the introduction of a note signed by Cecil Brunk; testimony of Mrs. C. A. Worrall regarding the feeling of Charles Boultinghouse, the deceased husband of Mrs. Boultinghouse, toward the proponent; the testimony of Mrs. Worrall regarding a conversation she had with proponent; her testimony and volunteering her opinion that the testatrix was crazy; her testimony regarding the manner in which testatrix walked; regarding the character, habits and condition of testatrix; the testimony of A. J. Bishop regarding the testatrix having taken dancing lessons; the testimony of Mrs. Jane Root regarding what Mrs. Crisler had told her about testatrix driving an automobile; the testimony of Mrs. Jane Root regarding what she had heard Cecil Brunk tell testatrix regarding

paying a note; the testimony of Mrs. Root with reference to what Mrs. Root told testatrix regarding Mrs. Boultinghouse's will; the testimony of Mrs. Root as to what contestee told her about testatrix and regarding statements she had heard Mrs. Bailey make regarding contestant and regarding statements made by testatrix with reference to her feeling toward contestant; and testimony of Mrs. Root regarding evidence of affection between testatrix and proponent; testimony of Dr. Joe C. Carter as to causes of death he had given on the death certificate of testatrix, and the admission of the inventory and appraisement filed in the estate of Charles Boultinghouse, deceased.

■ We will content ourselves by saying, as was said in Chambers v. Winn, supra, that in our opinion the testimony complained of other than that condemned as hearsay was admissible. Incapacity to make a will, like undue influence, is a subtle thing, and must be established to a great extent, at least so far as lay witnesses are concerned, by circumstantial evidence. The field should not be unduly limited or incapacity could never be shown, nor could the direct testimony tending to show testamentary capacity be impeached or questioned.

■ The fifteenth point complains of the admission over proponent's objection of the testimony of Mrs. Root as to what proponent told her about testatrix. The objection was that such testimony was immaterial and irrelevant. This general type of objection has been held many times to be insufficient. Appellant here contends that the testimony was inadmissible since Mrs. Root was permitted to testify in effect that Mrs. Bailey had told her Mrs. Boultinghouse was of unsound mind, without stating the facts on which she based such conclusion. We feel certain that a proper predicate will be laid before this testimony is admitted upon another trial, and that it is useless to discuss the point further.

The third point is that prejudicial error was committed by counsel for contestant in repeatedly seeking to develop evidence that

testatrix had been guilty of dishonest acts. On cross-examination of witness Cecil Brunk by contestant's counsel the question was propounded:

"Is it not true, Mr. Brunk, that after her association with him through these many years (referring to Mr. Fletcher, the owner of the Acme Laundry) and being a close friend, she falsified his books to his financial loss?"

Upon objection by proponent's counsel the objection was sustained. Later in cross-examining the witness Mrs. Mary Bowman, contestant's counsel propounded the following question:

"Would it have been the nature of Susan Boultinghouse under her normal self to falsify her books and embezzle from her employer?"

An objection was sustained and the jury instructed not to consider such questions for any purpose. This witness was again asked by contestant's counsel:

"Was it her nature (referring to testatrix) to do anything dishonest?"

Objection was again sustained. The further question was then asked:

"Other than her being hard to get along with and high tempered, you never knew of any difficulty that she had at the laundry?"

Objection was again sustained.

■■ Appellee here argues that the testimony which she sought to develop was admissible. That is beside the point. The court had ruled that it was inadmissible. In Sherwood v. Murray, Tex.Civ.App., 233 S.W.2d 879, 883, this court reversed a judgment because of such conduct of counsel. We there said:

"Appellant's points reveal an intentional and persistent effort on the part of appellee's counsel to inject into this case the extraneous matters above discussed, which they successfully accomplished, in some instances notwithstanding the court's adverse ruling. The court's failure to instruct as requested by plaintiff's counsel emphasized the improper conduct and argument."

While counsel was not so persistent in this case as in the Sherwood case, yet she did attempt to secure the admission of testimony which the court had ruled inadmissible. Although we held in the Sherwood case that the testimony elicited was inadmissible (and we hold that the testimony here sought to be elicited was also inadmissible, especially in view of the fact that the incident occurred some eight years prior to the execution of the will) yet this was not the basis of our decision in the Sherwood case. A judicial trial must be conducted with decorum and due respect for the rulings of the court. If counsel disagrees they may of course object, and urge error on appeal, but in the interest of an orderly trial they must refrain from persistently endeavoring to obtain the admission of evidence which the court had ruled inadmissible. The adverse effect of such conduct upon a jury we think is obvious. While we should hesitate to reverse the case on this ground alone, we feel counsel's attention should be called to the impropriety of such conduct.

The judgment is reversed and the cause remanded.

Reversed and remanded.

FRASER, Justice.

I concur in the disposition of this case for the following reasons: It is clear from the cases that have dealt with this question that various acts, incidents and eccentricities introduced as evidence and which had occurred shortly before or after the execution of the will have probative value only with reference to the testamentary capacity of testator at the time of the execution of the will. Navarro v. Garcia, Tex.Civ.App., 172 S.W. 723; Kutchinsky v. Zillion, Tex. Civ.App., 183 S.W.2d 237; Bell v. Bell, Tex.Civ.App., 248 S.W.2d 978; Bell v. Bell, Tex.Civ.App., 237 S.W.2d 688. It must be borne in mind that we deal here

with the offer of a will for probate where the burden is on the proponent to establish the testamentary capacity of the testator, and which probate was contested at the outset. This is not an attack on a judgment previously rendered admitting a will to probate, and we must keep in mind the location of the burden of the proof which the jury in this case held in effect proponent did not meet.

In the instant case we are confronted with a will that has no unnatural bequests and no provisions suggestive of any but an ordered mind bespeaking testamentary capacity. The testator's only relative was the contestant, a cousin living in California, and she was not without benefit under the will, as she was given a house. We are also confronted with the fact that there is no evidence that at the time she gave the information to her attorney and at the time she signed the will in the presence of the witnesses, of any unusual act indicating any lack of testamentary capacity, but the evidence was positively to the contrary, and strongly indicative of the complete possession of faculties. Although her friend did testify that she was uncertain in her gait when she saw her on her way to her attorney's office, she did further testify that testator told her quite lucidly where she was going and what she was going to do. Further it must be noted that undue influence was not any issue in this case. We therefore have a normal, logical will, executed by the testator in the presence of witnesses who testified positively that at the time of the signing of the will she appeared to be in full possession of her faculties and to know exactly what she wanted to do, and what she was doing with her property. Opposed to that there is a wealth of testimony dealing with incidents and phenomena suggesting a change in her personality and a weakening of her mental faculties. The courts have uniformly given great weight to the testimony of witnesses and attorneys who were present *at the time* of the execution of the instrument. For this reason we are forced to the conclusion that the jury's answer to the special issue submitted to it is so greatly against the preponderance of the evidence that it cannot be permitted to stand. There is no doubt from the wealth of testimony in this case that many of the testator's friends felt that she did things and said things that were not like herself, but her own doctor testified that a patient with her symptoms and maladies would have normal and lucid intervals between any seizures that she might suffer and it was evident that such seizures as she may have had were of very slight duration and not particularly intense when felt. We therefore have no choice but to reach the conclusion that the great weight of the evidence in this case preponderates against the finding of the jury, especially in view of the fact that those who dealt with her on the date of the preparation and at the actual signing of the will testified positively as to the soundness of her mind and the rationality of her actions *at that time*. The trial judge could only write the judgment he did write in answer to the jury's finding but we feel that in view of the above reasons he was in error in not granting a motion for a new trial. Bell v. Bell, Tex. Civ.App., 248 S.W.2d 978; Vaughan v. Malone, Tex.Civ.App., 211 S.W. 292; Bell v. Bell, Tex.Civ.App., 237 S.W.2d 688; Navarro v. Garcia, Tex.Civ.App., 172 S.W. 723; Whitney v. Murrie, Tex.Civ.App., 264 S.W. 270; Salinas v. Garcia, Tex.Civ. App., 135 S.W. 588; Milner v. Sims, Tex. Civ.App., 171 S.W. 784.