**J. A. KELSO et al., Appellants,**

**v.**

**N. R. HAWKINS et al., Appellees.**

**No. 10411.**

Court of Civil Appeals of Texas.

Austin.

June 27, 1956.

Rehearing Denied Aug. 8, 1956.

Hubbard & Hubbard, Temple, for appellants.

Owen P. Carpenter, Lee Curtis, Belton, for appellees.

HUGHES, Justice.

This is a will [1] contest. The testatrix is Isla A. Kelso who died in Bell County June 30, 1953. The will and codicil were dated December 10, 1952, and January 29, 1953.

The principal beneficiary of the will is appellee Southwestern Presbyterian Home and School for Orphans, the other appellee being its President N. R. Hawkins, who under terms of the will is Independent Executor of the estate of decedent.

Appellants who contested the will in the Probate Court and on appeal in the District Court are J. A., E. B. and Earl D. Kelso, Mrs. Ola Denman, a widow, and Mrs. Maurine McDonald et vir, brothers and sisters of decedent.

The will was admitted to probate in the County Court and in the District Court on appeal. The trial on appeal was to a jury but resulted in a directed verdict for appellees.

The only ground of contest was that testatrix was, at the time of executing the will and codicil, of unsound mind.

Appellants brief all points together and we will dispose of them in the same manner. They question the correctness of the instructed verdict.

It is our opinion that the directed verdict was improper.

Testatrix had a feeble minded sister.

Mrs. N. E. Cook, cousin of testatrix and a well educated person (degree from Baylor and graduate work at Columbia) testified to the following conversations with testatrix in the Fall of 1952 about their aged Aunt, Mrs. Naomi Parker, and their Aunt Annis Woodall:

"A. And she asked me what motivated my coming to see her and I said I just came to see you and I thought you would like some of our new pecans, and she said, well, I would like for you to know that I hate all of my mother's people, and my father—the old man, she said the old man, held on longer than she thought he would.

"Q. In other words, she was annoyed by him living, lingering so long? A. Yes

"Q. Go ahead. A. And she said, I would like to ask you while you are here, if Aunt Naomi—

"Q. That was Aunt Naomi Parker? A. Yes, has passed away, and I said, no, she hasn't. And then she said, well, I didn't want to miss that funeral because I wanted to plant ivy in her eyes and ears and nose and mouth.

"Q. She told you that? A. Yes, she did.

I. The word "will" and related terms will, for simplicity, be used without qualification but without any presumption of legality.

"Q. What was your re-action to that? A. Well, I was so stunned that I didn't have an answer and then I realized that an answer wouldn't be any good any way.

"Q. To plant ivy—did you say to plant ivy in her eyes and ears and nose and mouth? A. Yes.

"Q. Do you think she was joking? A. No, she was not joking.

"Q. Did she make some remarks about some of the other aunts at that time or at any other time close to that time? A. Yes, she said that my Aunt Annis Woodall, who lives in Oklahoma, had come down there, and that she wasn't ever going to allow her to come again. She passed away this past year, and that if she did she would get a buggy whip—I hate to say it—

"Q. Go right ahead. A. She said she would get a buggy whip and run her off.

"Q. Do you believe she meant that? A. Yes, she did."

Mr. Clem Countess, an attorney, had known testatrix for about forty years and had represented her and had been closely associated with her from about 1930 until her death. He testified, in part:

"A. Well, after the partition suit, and I believe that was closed up probably about February or March of 1948, I had numerous conversations with her. For one thing, I represented her in that, and she wanted me to be sure and fix it so that her brothers couldn't take it away from her, and I assured her that the arrangements were such that her brothers couldn't take the property away from her. I saw her and talked to her, I am sure, on an average of once a month, sometimes more frequently, for a period up to just a short time before she died, and I don't believe I had a single conversation with her that she didn't ask me if there was any chance of her broth-ers taking the property away from her. She bought a piece of property in Temple and I passed on the title for her, and I am sure she asked me, after she got that property, at least fifty times, if there was any chance for her brothers to take that property away from her.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Well, I will ask you this question: what was her general attitude in conversations and transactions with you as her attorney with reference to her brothers? A. She was very antagonistic always.

"Q. Do you know of any reason why she should have been antagonistic? A. No, during the whole time that I represented her for more than ten years, I never saw anything that either one of her brothers did that might incur her displeasure.

\*　　\*　　\*　　\*　　\*　　\*

"A. Anybody transacting business with Miss Isla would think she was perfectly sane, and on most points she was. Miss Isla I think was scrupulously honest, I don't think she would cheat anybody out of anything, but she was unbalanced in \* \* \* her relations to her brothers."

Mr. Countess also testified regarding a survey affecting some of her land:

"A. Well, we run the line over on the southeast corner next to the tract and that was sold to Beulah Watson. She had sold all that she had in that section. She did not own anything more there. When the surveyors ran down the west line of the Beulah Watson tract, they located the southeast corner about 15 feet away from where she originally had a stob set. She came up about the time we were setting that stob and she didn't want it moved. Well, it would just have left a little three-cornered strip in there without any—well, it wouldn't belong to anybody and they wouldn't have

the use of it. Anyway, Mr. Rabb put the corner where it ought to have been and that was right at the windup of the survey and she came back and said, what did you let them move that corner for? And I said, well, that is where it ought to have been and it didn't hurt you. I said, you are not losing a foot of land by it, and she said, I don't care, I don't want that corner moved, * * *"

Mrs. Velma Campbell, sister-in-law of testatrix, testified that upon the death of her husband Alan Kelso, testatrix refused to permit his burial in the family lot.

We believe that this testimony and such favorable inferences as could be drawn therefrom constituted some evidence, and not a mere scintilla, from which the jury could find testatrix of unsound mind when the will and codicil were executed.

We express no opinion upon the sufficiency of the evidence otherwise as the case was not fully developed.

There are some other matters which we must discuss briefly in view of a new trial.

■ The fact that Mr. Countess had read a book on mental diseases falls far short of making him an expert in this field and the trial court correctly so indicated. However his long and close acquaintance with testatrix does qualify him as a lay witness who may express his opinion as to her mental condition. The record does not show what his opinion was.

We presume that it would have been that she was of unsound mind at the time of the will and codicil. We believe that sufficient irrational acts were testified to by this witness to form a valid basis for such opinion.

■ We believe the testimony given by Mrs. Cook, set out above, also qualifies her to express an opinion of insanity. Such opinion, should, of course, be related to the critical time of the execution of the will and codicil.

The record does not show what the conversation was between Mrs. Cook and testatrix' mother in 1939, offered by appellants, and, of course, we do not know its relevancy. It does appear to be too remote. Bell v. Bell, Tex.Civ.App.Amarillo, 248 S.W.2d 978, writ ref. N.R.E.; In re Boultinghouse's Estate, Tex.Civ.App. El Paso, 267 S.W.2d 614, writ dismissed.

■ We do not believe that any witness should be permitted to express an opinion as to whether the relationship of testatrix with her family was "normal" or not. When the facts are brought out on this subject the jury is as well qualified as the witness to form its own opinion and in such cases should be permitted to do without any opinion evidence from the witness. 19 Tex. Jur. p. 13.

We overrule appellants' request to render judgment in their behalf. This case has not been fully developed and appellees plead that testatrix was of sound mind when the will and codicil were executed. Southwestern Drug Corp. v. McKesson & Robbins, 141 Tex. 284, 172 S.W.2d 485.

The judgment of the trial court is reversed and this cause is remanded.

Reversed and remanded.

### On Motion for Rehearing.

■ We agree that the burden of proof was on appellants to disprove the validity of the previously probated will. We make this statement in deference to appellees' suggestion of its importance.

■ Appellees complain that the evidence does not show appellants to have a justiciable interest in decedent's estate. The evidence shows that appellants are brothers and sisters of decedent. In our opinion this evidence is prima facie proof of interest and cast the burden on appellees of proving other facts which might destroy such interest.

■ Appellees also contend that there was no evidence to show when the will or

codicil was executed hence it was impossible for appellants to prove decedent's mental condition on such critical dates. This case was tried on the County Court pleadings. We quote from the pleading of the Executor:

"And now comes the Defendant and specially denies that the said Isla A. Kelso was of unsound mind or memory at the time that she executed said will dated December 10, 1952, or at the time that she executed the codicil to said will, which codicil is dated January 29, 1953."

Similar allegations were made in the intervention of the Presbyterian Home.

■ It is unnecessary to prove facts pleaded by one's adversary.

We recognize the weakness of the testimony to show mental incapacity but cannot convince ourselves that it does not constitute a scintilla of proof of such fact.

The motion is overruled.

Motion overruled.